3-12-0963 Joseph Ordonez, son of John Fogarty, the President of Covington, is the 4th Mayor of the Village of Unitellis, New York. Appellate by Thomas J. Gennady Joseph Ordonez, son of John Fogarty, the President of Covington, is the 4th Mayor of the Village of Unitellis, New York. Appellate by Thomas J. Gennady Appellate by Thomas J. Gennady, son of John Fogarty, the President of Covington, is the 4th Mayor of the Village of Unitellis, New York. culminating in a trial on the merits last April, and we are now before you on really only four issues that we were able to define through motion practice and at trial. The fundamental question for an election contest petition is this, does the electoral result reflect the will of the people? And we contend and we believe that the evidence shows that the result that has been reported in University Park in 2011 does not reflect the will of the people. And while our contest petition alleged a number of irregularities, we have isolated just four ballots that we contend would make the difference between Mr. Rudez being declared the victor over Ms. Covington. Overall, the reported result includes one vote that should not have been counted, and more importantly excludes three provisional ballots that should have been counted. Those were cast by individuals named Darla Boyd, Aaron Parker, and Sidney Bell. And each of these individuals' provisional ballots were not counted, not because of a fault of their own, but because of a government error. As we have set forth in our briefs and we've maintained throughout, Illinois courts do not and should not construe a government error against the vote. The controlling point of law on this are two cases by the Illinois Supreme Court, Pullen v. Mulligan and Craig v. Peterson from 1968. Pullen v. Mulligan stated, as a general rule, ignorance, inadvertence, mistake, or even intentional wrong will not be permitted to disenfranchise voters. Because to do so offends the 14th Amendment to the United States Constitution and Article 3 of the Illinois Constitution that guarantees that all elections be free and equal and every ballot legally cast has the same weight. Each of these provisional ballots should be opened and counted, and the evidence at trial amply supports this. Now first, in order to count a provisional ballot, the Illinois statute at the time, and it's very recently been changed, would count a provisional ballot as valid if three things occur. First, it's cast in the correct precinct. Second, the voter's affidavit is completely filled out. And third, the clerk is able to verify that the voter is registered at the address shown from information provided by either the voter, an election judge, the statewide voter database, the clerk's database, or the Secretary of State's database. And that third prong is where we have run into trouble here, as we will demonstrate. First, well, with regard to the third prong, that the voter, that the clerk is able to verify that the voter is registered at the address shown, in all three cases that we are going to argue, the clerk was not able to verify that the voter was registered at the address shown because the government record had been, was in error. So under no circumstances could the voter demonstrate what the statute requires. First, with regard to the ballot cast by Darla Boyd, the evidence shows that Ms. Boyd has resided at 689 Sullivan Lane in University Park since 2004. She's voted at that address many times and for years. At the 2011 municipal election, though, Ms. Boyd went to her polling place to cast her ballot. She was told, you're not on the voter roll. If you'd like to vote, you can, but you've got to cast a provisional ballot. So she did. She cast a provisional ballot. Now, why was Ms. Boyd's name not on the voter roll? Well, what happened was that the Secretary of State had mistakenly registered Ms. Boyd at another address, and that registration canceled her registration in University Park. In 2009, Ms. Boyd entered into a contract to purchase an investment property in Sauk Village, Illinois, in Cook County. In order to have utility service turned on at that address, Ms. Boyd was required to produce a state ID bearing her likeness and that Sauk Village address. So she went to the Secretary of State's office to obtain that ID. While at the Secretary of State's office, Ms. Boyd was asked, would you like to change your voter registration address to this Sauk Valley address, Sauk Village address, excuse me. She said no. It was not to be her primary address. It was an investment property. She bought it as an investment and as a place for her children to live. And she was not moving in. She did not want to transfer her registration. But what did the Secretary of State do? They processed a change of registration for her. Worse yet, the document with which they registered her to vote in Sauk Village does not bear her signature. So not only did she say no, she didn't sign anything, but yet it was put through. Now once her change of registration was processed in Cook County, that information was reflected to the Illinois State Board of Elections statewide voter database, which then noticed that we have a dual registration for Ms. Boyd, one in Cook, one in Will. The State Board of Elections database then notified Will County that there had been an updated registration for Ms. Boyd, and Will County canceled Ms. Boyd's University Park registration. So although Ms. Boyd's entire family was registered at her University Park address and was eligible to vote in the 2011 election, she was eligible to vote only a provisional ballot, and because of this error, her provisional ballot was not counted. So but for this error, Ms. Boyd's ballot would have been counted, and under the circumstances, we contend that the trial court plainly erred in determining that Ms. Boyd's ballot should not have been counted. Will County, though, gets this information. It's not counted. Actually, it was accurate information as far as registration in Cook County. So they did what they're supposed to do, didn't they? Well, they did, and Ms. Judy Wiedemeyer, and Will County does an excellent job with their elections. Let me say that. She said and admitted, even if the information we get is incorrect, we have to follow it. I mean, there's, you know, the mistake was made in Cook County, but Will County didn't make a mistake. You're right, a mistake was made in Cook County, but I don't think that that necessarily is dispositive. I think that this was a governmental, clerical error. The real mistake was at the Secretary of State's office, and we don't believe that that should function to invalidate and frankly disenfranchise Ms. Boyd. Because an important background policy thing is that any time anybody, do you have a hearing and go through all kinds of hearings then for every one of these kinds of situations? No, no, you wouldn't, and you can't. And this is only arising because this is such a, obviously such a close election, and only because we have properly vested the trial court with this matter. I wouldn't see this as a general policy that would apply to all registrations throughout the state. This is indeed extremely unique. The second ballot is that of Aaron Parker, and it is a similar situation. Mr. Parker, on January the 1st, 2011, went to the Illinois Department of Human Services office and registered to vote at his home in University Park, 515 Barrington Court. Mr. Parker was formerly registered in Blue Island and wanted to vote from his home in University Park. Pursuant to the National Voter Registration Act, which is popularly referred to as the Motor Voter Law, agencies such as the Illinois Department of Human Services are designated as voter registration agencies. At trial, Mr. Parker produced his application to vote, and he clearly did apply to become a registered voter. The problem here, however, was that the Illinois Department of Human Services failed to forward his registration to the Will County Clerk. And so, again, having no record of Mr. Parker registered at 515 Barrington Court, the Will County Clerk said, no, we will not count your provisional ballot. And what's interesting on the Parker ballot is that initially, the circuit court said, yes, that there's no question that he registered to vote, and there's no question that his ballot should be counted. And after, well, the court later, after further motion practice, determined that, well, just one vote isn't going to change the outcome, and so we're not going to count this vote after all. They did not. And honestly, they couldn't have provided anything else that would have demonstrated that they were registered to vote in University Park. So I'll move quickly then to Sidney Bell. Mr. Bell's provisional ballot is somewhat similar. Mr. Bell moved to University Park in fall of 2010, and in September of 2010, he registered to vote. He did not receive his voter registration card until December 2010 or January of 2011. In the meantime, he wanted to vote in the 2010 general election, and he did end up voting at his former address in Chicago and had to vote a provisional ballot. He was unaware that doing so would have inadvertently altered his registration, and ultimately his University Park voter registration was canceled. Our contention was that Mr. Parker was not informed that this would be the outcome. Mr. Bell. Yes, thank you. And we would concede that this is not as strong a case as the first two. And then the final ballot I'd like to focus on was that cast and counted by a gentleman named Jermall Wright. Mr. Wright voted from 548 Allen Lane in Monee Township Precinct 5, whereas he lived at 657 Sullivan Lane outside of Monee 5. The evidence that we provided to the trial court to demonstrate that he lived at 657 Sullivan Lane was overwhelming. We had testimony from his landlord of two years, who testified that he lived at 657 Sullivan Lane from November of 2009 through July of 2011. The landlord. What is our standard of review on each of these? Fairly erroneous. I would contend that these are mixed questions of fact and law, I would say. The landlord walked through the house monthly at 657 Lane, observed him there living with his family, and the landlord himself lived down the street. And then finally, the landlord evicted Mr. Wright in July of 2011, seemingly incontrovertible proof that he was there at 657 Sullivan Lane. When a voter casts a ballot in a precinct that is not their own, that ballot is invalid. And the remedy for such an invalid ballot cast is that all of the candidates in a particular race would receive a proportional reduction in the vote totals that they garnered in that precinct. Thank you very much. Thank you. Uncle, when you're ready. Good morning, your honors. May I please report? My name is Thomas Chaconetti. I represent Vivian Covington. As you've heard, she won this race by two votes, very highly contested election, about 1,300 votes cast. The trial court, after extensive trial on the merits and hearing motion practice and et cetera, said that she's still the winner by two votes. And my job here today is to try to convince you that it should stay that way. Your honors, on the council table there you see the record that Mr. Fogge and I put together. That's only a portion of the record in this case, but it's the portion that's pertinent to this case. And the reason I point out that to you, your honors, is that it exceeds 800 pages. This was a very, very fact-intensive inquiry, as all election contests are. The fundamental question I believe before the court is the standard of review. I think that's the key here. And the question that we must ask is, were the rulings of the trial court clearly erroneous? Was the decision of the trial court clearly erroneous? Is it obvious to a reasonable mind that there was a completely different opposite conclusion that should be drawn here? The cases are dispositive on the standard of review here. Gas Research, City of Belvidere, AFM Messenger, Sinkist-Hillegoop, Cardona County. Those last four cases are all election cases. This is a question of mixed-facts question of law. The trial court had to judge the credibility of the witnesses, had to go through mounds of materials, hundreds of pages of documents, 40 exhibits, hear testimony of witnesses. I think it's inappropriate at this point for either counsel or I to ask the court or for counsel or I to re-weigh the evidence. Dillevue, Sinkist, Cook County Republican Party speak directly to that. The question here is, did the court, which I think did a tremendous job, and I don't say it because I won, I lost issues here. We take our lumps with trial. We won some issues, we lost some issues. But the fact is, even on the issue that I lost with respect to Mr. Parker's failure, I cannot say in good conscience, and not being disingenuous standing before this court, that there is clear error in what the trial court did. We might have seen the evidence differently, but that's not the standard. There might be an attractive alternative, but that's not the standard. The standard is, did the trial court commit clear error? And we believe it did not. And I'd like to take you through the four ballots, and as with all things, there's two sides of the story, and this is ours. With Donald Boyd, the argument from the beginning has been an error was made by the government. The argument is an error was made by Donald Boyd, and sometimes there are consequences to your acts. This reminds me of when I was younger, my mother used to tell me all the time, don't go into the kitchen at Christmas and mess with the Christmas cookies. And of course, naturally, what do you do? You go in, your younger sister follows you, the jar breaks, I've got cookie crumbs all over me, it looks pretty incriminating, doesn't it? And what would my mother say to me? Well, the same thing I think we say here. If you hadn't gone there, you wouldn't have had the problem. If Donald Boyd had not gone to the Secretary of State's office and lied to the DMV, we wouldn't be here. And why do I say this? You're lying. Well, because the law requires for you to get an ID card from the Secretary of State or a driver's license, you must prove you're resident. You must make affirmative representations of fact that you reside at this place. Election law teaches us you can only reside and register to vote from one place. That's the Delk case and a whole series of others, Maxim, and then you follow along the line. So here's what we have. We have a woman who admits that she has two ID cards. I don't know if anybody in this room has two ID cards simultaneously from the Secretary of State, but she does. One she uses for utilities, for the convenience and purpose of her Soft Village property, the other she uses for purposes of voting. We know from the record, and she states so, that when she went to vote, she showed him an ID card. We don't know which card that was, but we can guarantee it wasn't the one that said Soft Village. So she has chosen a course of action here. And the chronology is critically important. She had a long-standing Illinois driver's license. In 2009, she goes to the Secretary of State for an ID card. In 2010, she rolls over her driver's license. Different addresses. First one, Soft Village, second, University Park. She testifies, she uses them both simultaneously all the time for different purposes. She goes to the polling place, attempts to vote, is not on the register. Why? Because the Soft Village address now supersedes the University Park address by operation of law. It is immaterial that she didn't sign the application. She had to affirmatively prove to the Secretary of State by two pieces of identification, and the administrative regulations outline what those are. But she resided at that address. You can't have it both ways. You can only reside in one place. So, come election day, she's permitted to vote provisional ballot. She admits in testimony she did not read the yellow receipt. She didn't follow the instructions. She didn't think much of it, whether it was a legal consequence. And she went on with her life. Those are direct quotations from the record. She never pursued her statutory rights to put things in the orange pouch of the receipt going back to the rural county clerk. She never showed up in two days to present anything to the clerk to establish her registration. Why? Because she couldn't. Because by her own act, she had canceled the first registration. On page 426 of the record, you'll see she even uses the word residence right, uh-huh, when I ask her a question relative to producing documents at the Secretary of State. Administrative rules are clear. Residency can be proven by utility subscriptions, all kinds of things. Delta's clear at this point. Maxim is clear, the so-called round-the-manual case. At the end of the day, unfortunately, when you're clever and when you're deceitful, you may be caught with that. And unfortunately, you can't have the benefit of a law and not suffer the consequences of that same law. If you want a Secretary of State ID card and need to reside at that address, now let's put aside the fact the statute requires you're supposed to surrender any other ID or license that you have at that time. Mr. Parker, what is not in dispute? The trial court ruled against me on this. It said his ballots should have been counted. We might have seen the evidence differently. But that's not the standard. I can't stand before you here and say the trial court did a tremendous job, and she did. And I don't practice in Will County, I practice primarily in Cook County. But I have to tell you that the experience of that court and the expertise of the Will County clerk is absolutely exemplary. And I couldn't stand before you with a straight face and say, she got it right, she did a great job, except the one time she ruled against me. It doesn't work like that. And the law in Sincus, Cardona, Cook County Republican Party is very clear on this. So I accept my loss. We lost the point. Now we get to the second part here. Should the ballot have been opened by the court? That was a decision by the court which is also not clearly erroneous and which you should sustain. Why? Because the law is very clear. It must change the result of the election. And that is the rule from Lisk, Whittler, McClaskin, and this very court in Loudoun. If you can't change the result, then the court doesn't add and subtract ballots. Well, what law is unclear in this case? Excuse me? What law is unclear? That's a more difficult case. It's from another district. It's a little more difficult on the facts. I think Loudoun is a little clearer, you know, here in your district. But the balance of election law does say that you need to change the result. And I think the court... No, I mean, what law in this case is unclear as far as what the law is in this district? Is there any unclear law? I'm sorry, Your Honor, I don't understand your question. On the legal questions. On this particular question, no. I don't think there's any doubt that you must change the result of the election. And I think that the court had a lot of factors in the court's mind it could have taken into account. First, the testimony, Mr. Parker. I wanted to make sure my vote counted next time. Secondly, the constitutional protection of sanctity of the ballot. Third, the fact that the Illinois civil practice law forbids us from inquiring into how you cast a ballot. And fourth, if you were to open up his ballot now, everybody would know how he voted for every office. And what would be the policy... What's the mixed question? The mixed question of law is, in this particular point, is for the court... The court had to look at all the evidence and determine, if I open this ballot, do I affect the outcome of the race? Or do I implicate other issues in the testimony of the witness himself who said, I want to make sure that next time when I go to Will County, my ballot is counted. And she also knew that several certifications had been made to the State Board of Elections. They have to be amended. And so these are practical considerations. Factual considerations. Yes, they're factual and they're practical. And so when she looks at that, and I can't keep them totally in her mind, but she did write a very detailed opinion, I suspect these are facts that were in the record. Mr. Bell is an interesting situation. Here's a gentleman who admits for 19 years he's illegally voting out of his father's house. The facts in this are pretty clear. He lives at one address with his parents for a series of years. He moves down the block a block or so away. He continues from the age of 23 to 42 to vote out of his father's address in Cook County in Chicago. Then he registers at University Park in September of 2010, but three times swears under oath at trial that he didn't move into University Park until the middle of October. He registered to vote before he resided there. You can't have it that way. You must register to vote where you reside. 32 days later, he goes back to Cook County, votes in the general election, again out of his father's house, albeit he lives in the 8th Ward in the city of Chicago, and he votes there by provisional ballot, comes back to University Park in April of 2011, and votes by provisional ballot again. What's the mixed question of law and fact in that? Well, the mixed question here is that he has, the fact finding by the trial court was, where in fact is he registered, where in fact is he living? And that's the fact question? Yes. And so now you apply, the legal point is you apply, is Neely dispositive to that? Is the Neely decision dispositive? Can you disclaim your public record of having signed the amnication of ballot in Cook County, establishing residency, being registered there, you'll see in the record around page 800 or so, all of his records. And so when you put those two together, the court balanced those facts against the law, said Neely was dispositive and did not count his ballot, or did not order it to be opened. Jamal Wright, this is a fascinating circumstance with Mr. Wright. It reminds me of when I was back in law school, and it's strange how things will come to you. My old professor John Walsh used to say to me, if, say to our class, if you get the Perry Mason moment, you know, irrelevant, incompetent, and immaterial, or it's hearsay, ask yourself the question, does he have the right witness? They had the wrong witness. They didn't have Jamal Wright. I learned this because I was on the opposite side, the losing side, of Maxon. And in Maxon, the Supreme Court taught us that intent is the key to abandonment. And intent is governed by what? The statements and the declarations and the actions of the voter. And the Supreme Court pointed us to Crites, Walsh, and Coffey. What's the mixed question of law and fact in this issue? Well, the mixed question here is, we had leases, we had documentation from the landlord. Those are factual matters. Those are factual matters. Now the question is, what law do we apply to that? The law of abandonment. From a Supreme Court? Yes, from Maxon. And two other things. We also apply, did they prove where he lived, and did they prove where they thought he lived? Because we now have testimony from the county clerk. Those are factual matters. Yes. Indicating that in Will County, and they have a very enlightened, very liberal standard of provisional ballots. Back where I come from, 2-3% of provisional ballots get counted. Here, about 50% get counted. And what they do is, if you end up at the right polling place on election day, but for having straightened out your registration records before then, your vote counts. The appellant never proved where they think he lived, so they can't disprove that he didn't get to the right polling place, and they didn't produce him by subpoena or testimony to get his intent. So how do we get the factors that Crites and Coffey and all these cases ask for? And Gibson, for example, we had a school board case out here in the 3rd District. Finally, it does matter whether the voters can correct the mistake. And the reply brief counsel implies that somehow I made this up, and I know it's nothing personal. We're good friends. But the fact of the matter is, I didn't make this up. The Supreme Court said so in Pullen and in McDonough, and you said so in Brasaldo. That it makes a difference whether the voter is present to correct the error. That's why uninitialed absentee ballots are counted, because the voter doesn't know in the polling place what happened. But the uninitialed ballot in the polling place, the voter can do something about it. Well, what do we have here? That's exactly what we have here. The voter can do something about this provisional problem. Produce documentation on election day or within 48 hours. Not one of the three voters, Parker, Bell, and Boyd, did that. Finally, there's a disenfranchisement argument. Nobody has the right to cast a ballot who is unqualified to cast a ballot. And we cited to you the records of the CONCON and the Equal Elections Clause, where that applies and all of that. Finally, there are no federal rights implied here. The Help America Vote Act provides provisional ballots in federal elections. Our statute provides for provisional ballots in state elections, and the Sandusky case out of the Sixth Federal Circuit gives us some guidance on this and says it is the law of the state that determines whether the ballot counts. H-A-B-A is about access and opportunity. But whether the vote counts, that's in the discretion of the state according to its law. And the motor voter cases say the same. Acorn says, from the Seventh Circuit, the state of Illinois, qualifications for vote are not changed. It's a principle of federalism. Justice Kennedy split the atom of sovereignty in his case, in the term limits case, versus Thornton. Wilson and Stevos say the same thing. And even though I know neither one of us briefed it or argued it, because it came down after we briefed here, the U.S. Supreme Court in the Arizona tribal case in the summer, there are at least 12 references in the majority opinion by Justice Scalia about the importance of the state prerogative controlling and determining legality of votes. I think this case is not in the briefs. Your citing of it opens up a possibility that you may want to respond to it. Counsel? This seems to be similar to four minor points. I just wanted to know if there was an opportunity to cite it. Is anybody really debating that issue? Pardon me? Is anybody really debating this? The brief of the appellant implies that the creation of the federal statutes creates a higher level of consideration and implicates federal constitutional rights. And my only point here, a very minor point here, is to say the state doesn't lose the ability to control the qualifications of ballot access or the qualifications of voting. The argument there is about scrutiny, right? That's right. It's the level of scrutiny. Counsel, your time is up. Thank you, Your Honor. I appreciate the time. Thank you. Counsel? I really just want to address two particular points. First, with respect to all three provisional ballots that we've been arguing over. Each of these three individuals brought suit on their own behalf after the election in 2011, after they were notified that, or that they heard, found out, that their ballots weren't being opened and were not counted. So all three exhibited this desire to have their ballots opened and counted. And with regard to the secrecy of the ballot, we agree that that is a constitutional guarantee. However, there are circumstances that are not all that uncommon in the election law world where you are able to determine exactly how a certain individual voted. If perhaps you are conducting a discovery recount in a particular precinct that only had one absentee ballot and you know exactly who it is, you know exactly how they voted. So that does happen sometimes. And in no way should the secrecy argument be used, especially in this context, as a sword or a shield against the desire of all three of these individuals to have their provisional ballots open. And then my second point I'd like to make is with respect to the intent of Jermall Wright. No, we were not able to, we did not produce Jermall Wright to tell us what his intent was, where did he live, 657 Sullivan Lane, or his prior address. We believe intent can be inferred by the actions of an individual. And in fact, that's more reliable, frankly, than just listening to what somebody says after the fact. We produced a quantum of evidence that demonstrated and from which the trial court should have inferred Jermall Wright's intent, his landlord's testimony, a certified document demonstrating his eviction from this other address. So we think that we have satisfied that intent prong and demonstrated the abandonment necessary from the earlier residents. Thank you. Thank you. We will be taking the matter under advisement and right now we will be in recess for a panel change.